## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| MISSION COAL WIND DOWN CO., LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:20-cv-00302 |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, and | ) | |
| AMERICAN GUARANTEE AND | ) | |
| LIABILITY INSURANCE COMPANY, | ) | |
| Defendants. | ) | |
| | ) | |

## NATIONAL UNION'S ANSWER AND AFFIRMATIVE DEFENSES TO MISSION COAL'S COMPLAINT AND COUNTERCLAIM FOR DECLARATORY RELIEF

NOW COMES Defendant, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. ("National Union") by and through its attorneys, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, and for its Answer and Affirmative Defenses to MISSION COAL WIND DOWN CO., LLC'S ("Mission Coal") Complaint and for its Counterclaim for Declaratory Relief states as follows:

## NATIONAL UNION'S ANSWER

1.      This is an insurance coverage action brought by Mission Coal against two insurance carriers, National Union and AGLIC. The defendant carriers, in derogation of their contractual, statutory, and common law duties, have wrongfully denied Mission Coal's claims for coverage by asserting improper constructions of their insurance policies. Moreover, the defendants have breached their duties of good faith and fair dealing. As a consequence of defendants' breaches, Mission Coal was left to defend itself against claims without the benefit of the insurance protection to which it is entitled.

**ANSWER:**    National Union admits only that this is an insurance coverage action brought by Mission Coal against National Union and American Guarantee and Liability Insurance Company ("AGLIC").  National Union denies the remaining allegations in paragraph 1.

2.     This action arises out of disputes relating to two insurance policies issued by defendants providing coverage to Mission Coal (the "Policies") for liability arising out of flooding of a mine owned by Bluestone Coal Corporation ("Bluestone Coal") that was first discovered in March 2015 in Wyoming County, West Virginia (the "Flooding Claims"). National Union and AGLIC either have expressly denied coverage, disputed their coverage obligations, or otherwise failed to acknowledge their obligations in response to Mission Coal's tender of such claims for defense and indemnification, thereby necessitating this action.

**ANSWER:**   National Union admits only that this action arises out of a dispute regarding whether two policies issued by National Union to Cliffs Natural Resources Inc. n/k/a Cleveland-Cliffs, Inc. ("Cliffs") cover certain defense costs incurred in a lawsuit brought by Bluestone Coal Corporation ("Bluestone").   National Union denies the remaining allegations in paragraph 2.

3.     Mission Coal seeks damages against the defendants for breach of contract regarding the duties to defend and indemnify and bad faith under the West Virginia Unfair Trade Practices Act, W. Va. Code 33-11-1, et seq. ("WVUTPA").

**ANSWER:**   National Union admits only that Mission Coal seeks damages for an alleged breach of the duty to defend and for alleged bad faith under the WVUPTA.  National Union denies that, as pled, Mission Coal's complaint seeks damages for breach of the duty to indemnify. National Union further denies that it breached any duty to defend or indemnify Mission Coal or that Mission Coal is entitled to damages under the WVUPTA.

4.     Additionally, Mission Coal seeks declarations of the rights, duties, and liabilities of National Union and AGLIC under the Policies with respect to settled underlying claims against Mission Coal arising from the Flooding Claims and the subsequent *Bluestone* Action.

**ANSWER:**    National Union admits that Mission Coal seeks the declarations described in paragraph 4.  National Union denies that Mission Coal is entitled to the declarations sought.

## PARTIES

5.     Plaintiff Mission Coal is and at all times pertinent was a Delaware limited liability company with its principal place of business in 35 West State of Franklin Road, Suite 5, PMB 281 Johnson City, TN 3 7604.

**ANSWER:**   National Union lacks information sufficient to form an opinion as to the

truth of the allegations in paragraph 5 and therefore denies them.

6. Defendant National Union is and at all times pertinent was an insurance company incorporated under the laws of the State of Pennsylvania with its principal place of business in New York, New York. Upon information and belief, at all relevant times National Union was and is licensed and duly authorized to conduct and transact business in the State of West Virginia.

**ANSWER:** National Union admits that it is an insurance company incorporated under the laws of the State of Pennsylvania with its principal place of business in New York, New York. National Union further admits that it is licensed to sell certain types of insurance policies in the state of West Virginia. National Union denies the remaining allegations of paragraph 6.

7. Defendant AGLIC is and at all times pertinent was an insurance company incorporated under the laws of the State of New York with its principal place of business in Schaumburg, Illinois. Upon information and belief, at all relevant times AGLIC was and is licensed and duly authorized to conduct and transact business in the State of West Virginia.

**ANSWER:** The allegations of paragraph 7 are directed at a party other than National Union and, therefore, no response is required. To the extent a response is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 7 and therefore denies them.

## JURISDICATION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. This action is between citizens of different states and the amount in controversy exceeds the $75,000 jurisdictional minimum.

**ANSWER:** National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 8 and therefore denies them. Further answering, National Union states that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334(b) because this action relates to a case arising under Chapter 11 (the plaintiff's bankruptcy).

9. This Court has personal jurisdiction over National Union and AGLIC because each transact business and contract to insure risks located with the State of West Virginia. National

Union and AGLIC have purportedly [sic] availed themselves of West Virginia insurance market and the protections of West Virginia laws.

**ANSWER:**   National Union admits that this Court has personal jurisdiction over it with

respect to this action.  National Union denies the remaining allegations of paragraph 9.

10.    Venue is proper in this Court pursuant to 28 U.S. C. §1391. A substantial part of the events giving rise to this action occurred in West Virginia, and National Union and AGLIC carry on regular business of selling insurance policies in West Virginia, selling insurance policies to residents of West Virginia, and adjusting insurance claims in West Virginia.

**ANSWER:**   The allegations contained in paragraph 10 call for a legal conclusion to

which no response is required.  To the extent an answer is required, the statute speaks for itself

and National Union denies the allegations in paragraph 10 to the extent they are inconsistent with

the statute.

## ACTUAL CONTROVERSY

11.    This Court has authority to grant declaratory judgment pursuant to 28 U.S.C. § 2201 because Mission Coal, National Union and AGLIC are engaged in an actual controversy susceptible to specific relief over the meaning of provisions in the Policies. This controversy is within the jurisdiction of this Court.

**ANSWER:**   National Union admits that this Court has authority to grant declaratory

judgment pursuant to 28 U.S.C. § 2201 because Mission Coal and National Union are engaged in

an actual controversy within the jurisdiction of this Court.  National Union lacks information

sufficient to form an opinion as to the truth of the remaining allegations in paragraph 11 and

therefore denies them.

## FACTUAL BACKGROUND

### A.    The Bluestone Action

12.    Bluestone Coal operated an underground coal mining operation at Mine No. 65 located in Wyoming County, West Virginia where it recovered coal from the Little Fire Creek coal seam.

**ANSWER:**   National Union lacks information sufficient to form an opinion as to the

truth of the allegations in paragraph 12 and therefore denies them.

13.    Pinnacle Mining Company, LLC ("Pinnacle") operated an underground coal mining operation several hundred feet below the level of Bluestone's Mine No. 65.

**ANSWER:**  National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 13 and therefore denies them.

14.    Target Drilling, Inc. ("Target") performed services related to mining and oil and gas extraction industries, including such services for Cliffs, Seneca, Pinnacle, and others.

**ANSWER:** National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 14 and therefore denies them.

15.    Seneca Coal Resources, LLC ("Seneca") was Pinnacle's parent company and participated in providing bonding, other financial resources and regulatory guarantees for Pinnacle's operations. Seneca was engaged in a joint venture with Pinnacle and others relating to Pinnacle's coal operations, including operations that were the subject of the *Bluestone* Action.

**ANSWER:**  National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 15 and therefore denies them.

16.    Seneca North American Coal, LLC ("SNAC") was previously known as Cliffs Natural Resources, Inc. ("Cliffs") and before December 22, 2015, was the parent company and owner of Cliffs North American Coal, LLC ("CNAC"), which in turn was the owner of Pinnacle. Cliffs provided or had a duty to providing bonding, secure insurance, fund pensions, and/or other financial resources and regulatory guarantees for Pinnacle's operations. Cliffs, in combination with Seneca, was engaged in a business venture with Pinnacle relating to its coal operations, including operations that were the subject of the *Bluestone* Action.

**ANSWER:**  National Union denies that Seneca North American Coal, LLC ("SNAC") was previously known as Cliffs Natural Resources, Inc. and before December 22, 2015, was the parent company and owner of Cliffs North American Coal, LLC ("CNAC").  National Union admits that prior to December 22, 2015, CNAC owned Pinnacle.  National Union lacks information sufficient to form an opinion as to the truth of the remaining allegations in paragraph 16 and therefore denies them.

17.     In early 2013, Cliffs and Pinnacle contacted Bluestone seeking permission to drill a vertical borehole shaft from the surface through a void (or inactive) area of Mine No. 65 located in a sealed-off portion of the mine. The borehole shaft was to be used for the purpose of installing a vertical dewatering system to enable Cliffs and Pinnacle to control water in the Pocahontas mining seam located approximately 420 feet below Mine No. 65. Bluestone gave Cliffs and Pinnacle permission to proceed with the penetration of its mine.

**ANSWER:** National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 17 and therefore denies them.

18.     The drilling activities were undertaken by Cliffs and Pinnacle, as well as Target, which was the principal drilling contractor on the project. Target, under the supervision and approval of Cliffs and Pinnacle, drilled the borehole such that it penetrated through an inactive portion of Mine No. 65. Target, Cliffs, Pinnacle, and others attempted to install casing into the borehole. During the course of drilling the borehole, they became aware that the drilling of the borehole had penetrated through one or more underground aquifers or water sources.

**ANSWER:** National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 18 and therefore denies them.

19.     In March 2015, Bluestone became aware of an increase in the amount of water behind the sealed areas of Mine No. 65, both in the section in which the borehole had penetrated and in an adjacent sealed section at a lower elevation. As a result of the increase in the pressure of the water behind the barrier seals, the water began to bypass the existing barriers and seals, permanently damaging the integrity of the seals and the surrounding strata such that they could no longer prevent the flow of water. Mining operations in Mine No. 65 had to be terminated by Bluestone due to the uncontrollable flooding.

**ANSWER:**  National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 19 and therefore denies them.

20.     On December 22, 2015, Mission Coal Company, LLC entered into an agreement with Cliffs, Seneca, and other related entities whereby Mission Coal Company, LLC assumed all liabilities in return for the assets, including mine operations, of Cliffs, Seneca, and other related entities.

**ANSWER:**  Denied.

21.     On July 7, 2016, Bluestone filed a civil action against Pinnacle and Target for the damages arising out of the flooding and ultimate closure of Mine No. 65 in United States District Court, Southern District of West Virginia, Charleston Division, Case No. 2:16-cv-06098 (the *"Bluestone* Action"). On March 23, 2017, Bluestone amended its complaint in the *Bluestone* Action to include claims against Seneca, SNAC, and Cliffs, among others.

**ANSWER:** Admitted.

22. On October 3, 2018, the *Bluestone* Action was resolved by settlement.

**ANSWER:** Admitted.

23. On October 14, 2018, Mission Coal Company, LLC filed for Chapter 11 bankruptcy in United States Bankruptcy Court, Northern District of Alabama, Case No. 18- 04177-11. The debtor in possession for Mission Coal Company, LLC in the bankruptcy is Mission Coal.

**ANSWER:** National Union admits that, on October 14, 2018, Mission Coal filed for

Chapter 11 bankruptcy in the United States Bankruptcy Court, Northern District of Alabama, Case

No. 18-04177-11. National Union lacks information sufficient to form an opinion as to the truth

of the remaining allegations in paragraph 23 and therefore denies them.

24. National Union provided Cliffs with a commercial general liability insurance policy evidencing that it maintained liability insurance under National Union Policy Number 190-31-41 (the "National Union Policy"). The National Union Policy provided Cliffs with commercial general liability insurance coverage for the period of April 15, 2013 through April 15, 2015. The National Union Policy provided Cliffs with coverage for liabilities arising out of the *Bluestone* Action and as a result of the sale and transfer of all relevant Cliffs assets to Mission Coal, in return for assuming all Cliffs liabilities, Mission Coal became the insured under the National Union policy, and National Union undertook to defend Mission Coal in the Bluestone Action accordingly and, as alleged above contributed toward the settlement of the Bluestone Action on behalf of Mission Coal, but failed to pay all outstanding defense costs.

**ANSWER:** National Union admits only that it issued two fully fronted commercial

general liability policies to Cliffs under the policy number 190-31-41, effective April 15, 2013 to

April 15, 2014 (the "2013-14 Cliffs Policy") and effective April 15, 2014 to April 15, 2015 (the

"2014-15 Cliffs Policy" and together with the 2013-14 Cliffs Policy the "Cliffs Policies").

National Union denies the remaining allegations of paragraph 24.

25. AGLIC provided Target with an umbrella liability insurance policy evidencing that it maintained liability insurance under AGLIC Policy Number GLO 9226057-04 (the "AGLIC Policy"). The AGLIC Policy provided Target with umbrella liability insurance coverage for the period of June 1, 2014 through June 1, 2015. The AGLIC Policy provided Target with coverage for liabilities arising out of the *Bluest one* Action because the underlying Arch Insurance Company policy exhausted and AGLIC's coverage was thereby triggered. The AGLIC Policy provided

Seneca with coverage for liabilities arising out of the *Bluestone* Action as an additional insured. As a result of Mission Coal acquiring all the assets and liabilities of Seneca, as alleged above, Mission Coal assumed the status of additional insured under the AGLIC policy for liabilities arising out of the *Bluestone* Action as an additional insured of Target. AGLIC paid sums to settle the Bluestone Action on Mission Coal's behalf, and had assumed defense obligations for Mission Coal. However, AGLIC failed and refused to pay all the outstanding defense fees.

**ANSWER:**  The allegations of paragraph 25 are directed at a party other than National Union and, therefore, no response is required.  To the extent a response is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 25 and therefore denies them.

### B.    Defendants' Breaches and Bad Faith Claims Handling

26.    At all times relevant herein, Defendant National Union failed and refused to pay outstanding defense fees based on the false claim that Mission Coal waived the right to recover such fees, when National Union contributed to the Bluestone Action settlement. National Union stubbornly refusal to pay fees despite no evidence that Mission Coal waived defense fees, and despite the contractual and legal obligation to pay such fees. National Union failed and refused to conduct any reasonable investigation, first demanded invoices and then refused to pay them and forced the insured to sue to recover the defense fees due and owing.

**ANSWER:**  Denied.

27.    At all times herein Defendant AGLIC failed and refused to pay outstanding defense fees based on various excuses including that very late in the Bluestone Action proceeding it engaged its own panel counsel who only monitored the lawsuit, all while reserving rights to deny coverage and in obvious conflict. AGLIC failed and refused to conduct any reasonable investigation to determine the outstanding fees due and owing. After demanding invoices and proof of the defense fees owing from their additional insured Mission Coal and receiving such proofs, AGLIC failed and refused to pay them the outstanding defense fees and forced the additional insured to sue to recover the defense fees due and owing.

**ANSWER:**  The allegations of paragraph 27 are directed at a party other than National Union and, therefore, no response is required.  To the extent a response is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 27 and therefore denies them.

## COUNT ONE
### (Declaratory Judgment)

28.     Mission Coal incorporates paragraphs 1 through 27 as set forth fully herein.

**ANSWER:** National Union incorporates its answers to paragraphs 1 through 27 as set forth fully herein.

29.     Under the National Union Policy, Mission Coal is an insured with respect to the liability arising out of Cliffs operations.

**ANSWER:**  Denied.

30.     Under the AGLIC Policy, Mission Coal is an additional insured with respect to liability arising out of Target Drilling's operations.

**ANSWER:**  The allegations of paragraph 30 are directed at a party other than National Union and, therefore, no response is required.  To the extent a response is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 30 and therefore denies them.

31.     The Flooding Claims took place during Cliffs' operations under the terms of the National Union Policy.

**ANSWER:**  National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 31 and therefore denies them.

32.     The Flooding Claims took place during Target Drilling's operations under the terms of the AGLIC Policy.

**ANSWER:**  The allegations of paragraph 32 are directed at a party other than National Union and, therefore, no response is required.  To the extent a response is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 32 and therefore denies them.

33.     Mission Coal's alleged liability with respect to the Flooding Claims, including claims asserted in the *Bluestone* Action, arises out of Cliffs' operations and/or premises under the terms of the National Union Policy.

9

**ANSWER:** Denied.

34.     Mission Coal's alleged liability with respect to the Flooding Claims, including claims asserted in the *Bluestone* Action, arises out of Target Drilling's operations under the terms of the AGLIC Policy.

**ANSWER:**  The allegations of paragraph 34 are directed at a party other than National

Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 34

and therefore denies them.

35.     Mission Coal is insured under the National Union Policy with respect to the Flooding Claims, including the *Bluestone* Action admitted coverage by paying toward the settlement thereof but failed and refused to pay outstanding defense fees.

**ANSWER:**  Denied.

36.     Mission Coal is an additional insured under the AGLIC Policy with respect to the Flooding Claims, including the *Bluestone* Action admitted coverage by paying toward the settlement thereof but failed and refused to pay outstanding defense fees.

**ANSWER:** The allegations of paragraph 36 are directed at a party other than National

Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 36

and therefore denies them.

37.     Mission Coal is informed and believes and thereupon alleges that National Union disputes the contentions contained in the preceding paragraphs.

**ANSWER:**   National Union admits that it disputes the contentions contained in the

preceding paragraphs that are directed at National Union.  The remaining allegations of paragraph

37 are directed at a party other than National Union and, therefore, no response is required.  To

the extent a response is required, National Union lacks information sufficient to form an opinion

as to the truth of the allegations in paragraph 37 and therefore denies them

38.     Mission Coal is informed and believes and thereupon alleges that AGLIC disputes the contentions contain in the preceding paragraphs.

**ANSWER:**  The allegations of paragraph 38 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 38 and therefore denies them.

39.     An actual controversy of a justiciable nature has arisen and exists between Mission Coal, National Union and AGLIC concerning the allegations set forth in this Count One.

**ANSWER:**  National Union admits an actual controversy of a justiciable nature has arisen and exists between Mission Coal and National Union.  National Union lacks information sufficient to form an opinion as to the truth of the remaining allegations in paragraph 39 and therefore denies them.

## COUNT TWO
### (Breach of Contract)

40.     Mission Coal incorporates paragraphs 1 through 39 as set forth fully herein.

**ANSWER:**  National Union incorporates its answers to paragraphs 1 through 39 as set forth fully herein.

41.     Mission Coal is insured under the National Union Policy with respect to the *Bluestone* Action.

**ANSWER:**  Denied.

42.     Mission Coal is an additional insured under the AGLIC Policy with respect to the *Bluestone* Action.

**ANSWER:**  The allegations of paragraph 42 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 42 and therefore denies them.

43.    The *Bluestone* Action sought "damages" against Mission Coal because of "property damage" arising out of an "occurrence," as those terms are defined in, or otherwise within the meaning of, the National Union Policy. National Union admitted the duty to indemnify paying toward the settlement of the Bluestone Action, but failed to pay outstanding defense fees.

**ANSWER:**  Denied.

44.    The *Bluestone* Action sought "damages" against Mission Coal because of "property damage" arising out of an "occurrence," as those terms are defined in, or otherwise within the meaning of, the AGLIC Policy. AGLIC admitted the duty to indemnify paying toward the settlement of the Bluestone Action, but failed to pay outstanding defense fees.

**ANSWER:**    The allegations of paragraph 44 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 44 and therefore denies them.

45.    National Union has an admitted duty to indemnify and defend Mission Coal under the National Union Policy with respect to the claims asserted against it in the *Bluestone* Action.

**ANSWER:**  Denied.

46.    AGLIC has an admitted duty to indemnify and defend Mission Coal under the AGLIC Policy with respect to the claims asserted against it in the *Bluestone* Action.

**ANSWER:**    The allegations of paragraph 46 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 46 and therefore denies them.

47.    National Union had timely notice under the National Union Policy of the claims against Mission Coal in the *Bluestone* Action.

**ANSWER:**  Denied.

48.    AGLIC had timely notice under the AGLIC Policy of the claims against Mission Coal in the *Bluestone* Action.

**ANSWER:** The allegations of paragraph 48 are directed at a party other than National

Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 48

and therefore denies them.

49.     Mission Coal timely sought National Union's consent, not to be unreasonably withheld, for Mission Coal's proposed reasonable settlement of liability in the *Bluestone* Action. National Union admitted coverage and contributed to the settlement, but failed to pay outstanding defense costs.

**ANSWER:** Denied.

50.     Mission Coal timely sought AGLIC's consent, not be unreasonably withheld, for Mission Coal's proposed reasonable settlement of liability in the *Bluestone* Action. AGLIC admitted coverage and contributed to the settlement, but failed to pay outstanding defense costs.

**ANSWER:** The allegations of paragraph 50 are directed at a party other than National

Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 50

and therefore denies them.

51.     Following Mission Coal's reasonable settlement of its liability in the *Bluestone* Action, National Union's duty to defend is mature, has not been excused, and has not been discharged.

**ANSWER:**  Denied.

52.     Following Mission Coal's reasonable settlement of its liability in the *Bluestone* Action, AGLIC's duty to defend is mature, has not been excused, and has not been discharged.

**ANSWER:** The allegations of paragraph 52 are directed at a party other than National

Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 52

and therefore denies them.

53.     National Union has refused to perform its contractual duty to defend Mission Coal with respect to the *Bluestone* Action.

**ANSWER:**  Denied.

54.    AGLIC has refused to perform its contractual duty to defend Mission Coal with respect to the *Bluestone* Action.

**ANSWER:** The allegations of paragraph 54 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 54 and therefore denies them.

55.    Mission Coal has discharged, or is excused from discharging, any obligation to perform conditions precedent to coverage and any covenants, the breach of which would form a partial or total defense of National Union's performance.

**ANSWER:** Denied.

56.    Mission Coal has discharged, or is excused from discharging, any obligation to perform conditions precedent to coverage and any covenants, the breach of which would form a partial or total defense of AGLIC's performance.

**ANSWER:** The allegations of paragraph 56 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 56 and therefore denies them.

57.    National Union's refusal to perform its contractual duty to defend Mission Coal is a breach of the National Union Policy.

**ANSWER:** Denied.

58.    AGLIC's refusal to perform its contractual duty to defend Mission Coal is a breach of the AGLIC Policy.

**ANSWER:** The allegations of paragraph 58 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 58 and therefore denies them.

59.    As a direct and proximate result of National Union's breach of its contractual obligation to defend, Mission Coal has incurred damages in an amount to be determined at trial.

**ANSWER:** Denied.

60.    As a direct and proximate result of AGLIC's breach of its contractual obligation to defend, Mission Coal has incurred damages in amount to be determined at trial.

**ANSWER:** The allegations of paragraph 60 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 60 and therefore denies them.

### COUNT THREE
### (Bad Faith in Violation of WVUTPA)

61.    Mission Coal incorporates paragraphs 1 through 60 as set forth fully herein.

**ANSWER:**  National Union incorporates its answers to paragraphs 1 through 60 as set forth fully herein.

62.    National Union violated the WVUTPA by engaging in the following activities as a general business practice:

a.    Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue (including, among other things, failing and refusing to acknowledge that Mission Coal was in insured under the policy; failing and refusing to acknowledge that the property damage claimed was covered or potentially covered under the policy; asserting irrelevant exclusions somehow barred coverage; refusing to pay submitted invoices, after demanding they be provided, by falsely asserting that the insureds demanded the policy be exhausted by paying part of the settlement and that somehow defense costs were waived, when National Union knew very well no defense costs were waived.

b.    Failing to acknowledge and act reasonably promptly upon communication with respect to claims arising under the National Union Policy (including, among other things failing and refusing to pay defense costs on the false grounds that Mission Coal somehow waived recovery of defense costs in asking National Union to participate in settlement of the claims.

c.    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under the Policies;

        d.     Refusing to pay claims without conducting a reasonable investigation based upon all available information;

        e.     Not attempting in good faith to effectuate prompt, fair, and equitable settlements of defense cost claims in which liability has become reasonably clear; and

        f.     Failing to promptly provide a reasonable explanation of the basis in the National Union Policy in relation to the facts or applicable law for denial of Mission Coal's defense cost claim or for the offer of a compromise settlement.

**ANSWER:** Denied.

63.     Taken as a whole, these separate, discrete violations of the WVUTP A constitute a general business practice by National Union

**ANSWER:** Denied.

64.     As a direct and proximate result of National Union's UTPA violations, Mission Coal has been harmed and sustained damages, including but not limited to being compelled to expend money for attorneys' fees and costs and out-of-pocket expenses to secure the benefits owed to it by National Union.

**ANSWER:** Denied.

65.     National Union engaged in conduct described in this count with conscious disregard of Mission Coal's rights and with a willful and malicious intention to injure Mission Coal's rights to receive the benefits of its contracts.

**ANSWER:** Denied.

66.     Accordingly, Mission Coal also is entitled to punitive damages in an amount appropriate to punish or make an example of National Union.

**ANSWER:** Denied.

67.     AGLIC violated the WVUTPA by engaging in the following activities as a general business practice:

        a.     Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue (including, among other things, misrepresenting that Mission Coal was somehow not an additional insured under the policy denying the terms and conditions part of the purchase order required the named insured Target Drilling to make Mission Coal an insured under the policy); that the Underlying Arch policy was not somehow exhausted by payment of defense costs and settlement and that the property damage at issue was somehow not covered in the policy; demanding then receiving detailed defense invoices then refusing to acknowledge that the invoices are defense costs to be paid.

b.      Failing to acknowledge and act reasonably promptly upon communication with respect to claims arising under the AGLIC Policy including, among other things, failing and refusing to acknowledge coverage and paying submitted defense invoices; and falsely claiming that Mission Coal waived defense fee recovery.

c.      Failing to adopt and implement reasonable standards for the prompt investigation of defense cost claims arising under the Policies;

d.      Refusing to pay claims without conducting a reasonable investigation based upon all available information;

e.      Not attempting in good faith to effectuate prompt, fair, and equitable settlements of defense cost claims in which liability has become reasonably clear; and

f.      Failing to promptly provide a reasonable explanation of the basis in the AGLIC Policy in relation to the facts or applicable law for denial of Mission Coal's defense costs claim or for the offer of a compromise settlement.

**ANSWER:** The allegations of paragraph 67 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 67 and therefore denies them.

68.     Taken as a whole, these separate, discrete violations of the WVUTPA constitute a general business practice by AGLIC.

**ANSWER:** The allegations of paragraph 68 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 68 and therefore denies them.

69.     As a direct and proximate result of AGLIC's UTPA violations, Mission Coal has been harmed and sustained damages, including but not limited to being compelled to expend money for attorneys' fees and costs and out-of-pocket expenses to secure the benefits owed to it by AGLIC.

**ANSWER:** The allegations of paragraph 69 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union

lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 69 and therefore denies them.

70.     AGLIC engaged in conduct described in this count with conscious disregard of Mission Coal's rights and with a willful and malicious intention to injure Mission Coal's rights to receive the benefits of its contracts.

**ANSWER:** The allegations of paragraph 70 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required, National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 70 and therefore denies them.

71.     Accordingly, Mission Coal also is entitled to punitive damages in an amount appropriate to punish or make an example of AGLIC.

**ANSWER:** The allegations of paragraph 71 are directed at a party other than National Union and, therefore, no response is required.  To the extent an answer is required,  National Union lacks information sufficient to form an opinion as to the truth of the allegations in paragraph 71 and therefore denies them.

## AFFIRMATIVE DEFENSES

National Union raises the following affirmative defenses to Mission Coal's Complaint.  By setting forth defenses below, National Union does not assume the burden of proof on any issue that the law requires the Plaintiff to establish in order to obtain the relief requested in the Complaint.

### First Affirmative Defense
#### (Insured Status)

Neither Mission Coal nor its subsidiary Seneca are insureds under the Cliffs Policies.  The Cliffs Policies insure Cliffs as well as its subsidiaries, associated, affiliated, allied or acquired companies or corporations of which Cliffs had more than 50% ownership interest in or exercised

management or financial control over and Cliffs' joint ventures, but only to the extent such entities were disclosed to National Union prior to the Cliffs Policies' issuance.  Neither Mission Coal nor Seneca were a subsidiary, associated, affiliated, allied or acquired company or corporation of which Cliffs had more than 50% ownership interest in or exercised management or  financial control over, or formed joint ventures with, Cliffs prior to the issuance of the Cliffs Policies, nor were they disclosed as such to National Union prior to the issuance of the Cliffs Policies.

**Second Affirmative Defense**
**(Other Insurance)**

The Cliffs Policies provide coverage in excess of other available insurance.   On information and belief, other insurance was available to Mission Coal as well as its subsidiaries, and other insurers had agreed to defend its subsidiary, Pinnacle.  National Union therefore had no duty to defend Mission Coal or its subsidiaries, Seneca, SNAC or Pinnacle in the Bluestone Action.

**Third Affirmative Defense**
**(Exhaustion of the 2014-15 Cliffs Policy)**

The 2014-15 Cliffs Policy has a $3 million limit per occurrence and in the aggregate.  The limits apply to both defense costs and indemnity.  National Union has paid the full $3 million limit of the 2014-15 Cliffs Policy in defense costs and/or indemnity, and therefore, has no further obligation to defend or indemnify any insured under the 2014-15 Cliffs Policy.  Further, Mission Coal and/or its subsidiaries have waived, or are estopped from asserting, any argument that the 2014-15 Cliffs Policy is exhausted by failing to object to Bluestone's Motion to Enforce Settlement or National Union's responsive statement.

**Fourth Affirmative Defense**
**(Impairment of the 2013-14 Cliffs Policy)**

The 2013-14 Cliffs Policy has a $3 million limit per occurrence and in the aggregate. National Union has paid defense costs in the Bluestone Action under the 2013-14 Cliffs Policy

19

and may have paid defense or indemnity in other lawsuits.  Additionally,  Plaintiffs in an action captioned *Jones v. National Union Fire Insurance Company of Pittsburgh, Pa.*, No. 01-CV-2020-901949, filed in the Circuit Court of Jefferson County, Alabama (the "Oak Grove Plaintiffs"), assert that they are entitled to payment of $900,000 under the 2013-14 Cliffs Policy.  The Oak Grove Plaintiffs' claim for coverage under the 2013-14 Cliffs Policy arises out of a $3 million settlement they entered into in February 2018 with Mission Coal subsidiaries Oak Grove Land Resources ("Oak Grove") and SNAC.  According to the Oak Grove Plaintiffs, Mission Coal and/or its subsidiaries paid only $2.1 million of this amount before filing for bankruptcy on October 14, 2018.  On information and belief, Mission Coal's claim for coverage under the 2013-14 Cliffs Policy rests on a tender made to National Union in March 2018 for defense costs incurred thereafter.  Because the Oak Grove Plaintiffs' claim predates Mission Coal's claim, if covered, the Oak Grove Plaintiffs' claim has priority over Mission Coal's claim.  Payment of the Oak Grove Plaintiffs' claim may impair or exhaust the 2013-14 Cliffs Policy's limits.  National Union's obligation to pay Mission Coal under the 2013-14 Cliffs Policy—if any—is capped at available policy limits.

### Fifth Affirmative Defense
### (Late Notice Under the Cliffs Policies)

The Bluestone Action was filed on July 7, 2016.  Mission Coal subsidiary, Pinnacle, first tendered its own defense to National Union on or after March 9, 2018.  Mission Coal, Seneca and SNAC never tendered their defense to National Union under the Cliffs Policies.  The failure of Mission Coal and its subsidiaries to give timely notice of the Bluestone Action precludes or limits the coverage available under the Cliffs Policies.

**Sixth Affirmative Defense**
**(Voluntary Payments Under Both Policies)**

The Cliffs Policies prohibit the insured from assuming any obligation or making any payment without National Union's consent. Mission Coal and/or its subsidiaries Seneca, SNAC and Pinnacle retained Steptoe & Johnson and White & Case to defend them in the Bluestone Action without timely notice to, or consent from, National Union. Therefore, these payments were voluntary payments and are not covered under the Cliffs Policies. Additionally, beginning in June 2018, AGLIC retained Doug LaSota of Marshall Dennehey to defend Pinnacle in the Bluestone Action. Any further work by White & Case thereafter was a voluntary payment.

**Seventh Affirmative Defense**
**(Reasonable and Necessary)**

National Union's obligation to pay defense costs under the Cliffs Policies is limited to reasonable defense costs. The amounts invoiced by White & Case were neither reasonable nor necessary to any insured's defense in the Bluestone Action. White & Case had no expertise in mining litigation or West Virginia law, and therefore, was unqualified to act as defense counsel in the Bluestone Action. Further, White & Case charged as much $1,175 per hour for its attorneys' time. This rate is facially unreasonable. Additionally, beginning in June 2018, AGLIC retained Doug LaSota of Marshall Dennehey to defend Pinnacle in the Bluestone Action. After Mr. LaSota's retention, any additional work by White & Case on behalf of Pinnacle was neither reasonable nor necessary.

**NATIONAL UNION'S COUNTERCLAIM FOR DECLARATORY RELIEF**

National Union brings this Counterclaim for declaratory relief against Plaintiff Mission Coal Wind Down LLC f/k/a Mission Coal Company ("Mission Coal"). In support of its Counterclaim, National Union alleges the following facts.

**NATURE OF THE ACTION**

1.      This case involves a dispute regarding whether Mission Coal is entitled to coverage under two fully fronted liability policies that National Union issued to Cliffs Natural Resources, Inc. n/k/a Cleveland-Cliffs-Inc. ("Cliffs"):  Policy No. 190-31-41, effective April 15, 2013 to April 15, 2014 (the "2013-14 Cliffs Policy"); and Policy No. 190-31-41, effective April 15, 2014 to April 15, 2015 (the "2014-15 Cliffs Policy" and together with the 2013-14 Cliffs Policy, "the Cliffs Policies").

2.      Mission Coal asserts that the Cliffs Policies cover defense costs incurred in an underlying case captioned *Bluestone Coal Corporation v. Pinnacle Mining Company*, No. 2-16-cv-06098, filed in the Federal District Court for the Southern District of West Virginia (the "Bluestone Action").

3.      The Bluestone Action was filed in July 2016 by Bluestone Coal Corporation and Double Bonus Mining Company ("Bluestone") and eventually named three Mission Coal subsidiaries as defendants: Seneca Coal Resources LLC ("Seneca"); Seneca North American Coal, Inc. f/k/a Cliffs North American Coal, Inc. ("SNAC"); and Pinnacle Mining Company ("Pinnacle").

4.      On information and belief, the Bluestone Action arose out of events that began years earlier, in the summer of 2013, when two of these three subsidiary defendants—SNAC and Pinnacle—were owned by National Union's named insured, Cliffs.

5.      In December 2015, Seneca purchased SNAC and Pinnacle from Cliffs.  As partial consideration for the acquisition, Seneca agreed to assume their existing liabilities, including liability for the damages at issue in the Bluestone Action.

6.      On information and belief, in January 2018, a year-and-a-half after the Bluestone Action was filed, Mission Coal acquired Seneca and, with it, SNAC and Pinnacle.  After the

acquisition, Seneca retained New York law firm White & Case to defend the Bluestone Action. Between its retention in early 2018 and the settlement of the Bluestone Action on October 3, 2018, White & Case billed Seneca over $2 million.

7.    Mission Coal now seeks to recoup these costs from Cliffs' insurer, National Union, incorrectly asserting that it acquired rights under the Cliffs Policies when it acquired Seneca, SNAC and/or Pinnacle.

8.    National Union disputes that Mission Coal is entitled to reimbursement for these costs. The Cliffs Policies do not insure either Mission Coal or its subsidiary Seneca, and neither Mission Coal nor Seneca obtained an assignment of rights under the Cliffs Policies from Cliffs. Therefore, they have no independent rights under the Cliffs Policies.

9.    Mission Coal and/or Seneca are similarly not entitled to recover amounts they purportedly expended to defend SNAC or Pinnacle. Seneca assumed SNAC and Pinnacle's liabilities in its 2015 agreement with Cliffs. The Cliffs Policies are fully fronted, meaning that Cliffs is obligated to reimburse National Union for all payments it makes under the Cliffs Policies. As a result, permitting Mission Coal to obtain reimbursement under the Cliffs Policies effectively undoes the parties' contractual agreement.

10.    Finally, the plain language of the Cliffs Policies limits or precludes coverage for these costs for the following reasons:

a.  The Cliffs Policies' other insurance clauses state that they apply excess other available coverage, and another carrier retained counsel to defend Pinnacle in the Bluestone Action;

b.  The applicable limit of the 2014-15 Cliffs Policy applies to both defense costs and indemnity, and the applicable limit of the 2014-15 Cliffs Policy has been

exhausted; and

    c.   The applicable limit of the 2013-14 Cliffs Policy applies to both defense costs and indemnity, and the applicable limit of the 2013-14 Cliffs Policy is impaired.

11.    Therefore, National Union is entitled to a declaration that it has no duty to reimburse Mission Coal for defense costs incurred in the Bluestone Action.

## THE CLIFFS POLICIES

12.    Cliffs is a mining company incorporated under the laws of the State of Ohio and headquartered in Cleveland, Ohio.

13.    It purchased the Cliffs Policies from National Union for annual periods effective April 15, 2013 and April 15, 2014, respectively.  Attached hereto as Exhibits A and B are true and correct copies of the Cliffs Policies.

14.    Each of the Policies is subject to a $3 million occurrence limit and a $3 million aggregate limit.

15.    The Insuring Agreements of both Policies provides:

    a.   [National Union] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  [National Union] will have the right and duty to defend the insured against any "suit" seeking those damages…

    (1) The amount we will pay for damages is limited as described in Section **III**- Limits of Insurance; …

16.    Per the Defense Costs Within Policy Limits Endorsement, the Insuring Agreements further provide:

    (2) Our right and duty to defend such claims or "suits" end when we have used up the applicable limit of insurance in the payment of judgements or settlements under Coverages A or B, defense costs (as such costs are described in Section B of this endorsement, entitled DEFENSE COSTS), or medical expenses

under Coverage C.   These provisions apply both to claims and "suits" pending at the time the applicable limit of insurance is used up and to claims and "suits" filed thereafter.

(3) When we control the defense of a claim or "suit", we will pay for defense costs. If by mutual agreement or court order you assume control of the defense of a claim or "suit" before the applicable limit of insurance available is exhausted, we will reimburse you for reasonable defense costs.   In either case, however, the amounts we pay will reduce the limit of insurance available.

17.     Both Cliffs Policies define "insured" as any person or organization qualifying as such under Section II-WHO IS AN INSURED.

18.     Section II-WHO IS AN INSURED provides that the person or entity identified as Named Insured on the Policy's Declarations page qualifies as an insured.

19.     The Cliffs Policies' Declarations identify Cliffs as the Named Insured.

20.     The Cliffs Policies' Broad Form Named Insured Endorsement further provides:

Policy Declarations, "Named Insured" is revised to include:

"Named Insured" means the person or organization first named as the Named Insured on the Declarations Page of this policy (the "First Named Insured").   Named Insured also includes: (1) any other person or organization named as a Named Insured on the Declarations Page; (2) any subsidiary, associated, affiliated, allied or acquired company or corporation (including subsidiaries thereof) of which any insured named as the Named Insured on the Declarations Page has more than 50% ownership interest in or exercises management or financial control over at the inception date of this policy, provided such subsidiary, associated, affiliated, allied or acquired company or corporation and their operations have been declared to Us prior to the inception date of this policy; (3) any joint venture, partnership or limited liability company to which the First Named Insured or Named Insured on the Declarations Page has a membership interest, provided such joint venture, partnership or LLC has been declared to us prior to the inception date of this policy.

21.     Per the Cliffs' Policies Deductible Coverage Endorsement, the Named Insured is obligated to reimburse National Union for all defense costs or indemnity paid under the Cliffs

Policies.  It provides:

    **I.**    **Payment and Deductible Conditions**

        A.  **We will pay** all sums that we become obligated to pay up to our Limit of Insurance under the policy to which this endorsement applies.  Our Limit of Insurance includes, and shall not apply in addition to, any sum that you must reimburse us for damages, benefits or Medical Payments we have paid.

        B.  **You must reimburse us** up to the Deductible Limit(s) shown in the Schedule for any amounts we have so paid as damages, benefits or Medical Payments.  The Deductible will apply to each "occurrence", "accident", offense, claim or other basis as shown in the Schedule, regardless of the number of persons or organizations who sustain damages because of an "occurrence" or "accident" or offense or other basis shown in the Schedule.

        C.  **In addition, you must reimburse us** for all "Allocated Loss Adjustment Expense" we pay as Supplementary Payments, according to the election indicated by an "X" below.  If no election is indicated, election i. applies.

                                    [ X ]  i.  All "Allocated Loss Adjustment Expense" up to the deductible limit.  However, the most you must reimburse us for damages, benefits, Medical Payments and "Allocated Loss Adjustment Expense" combined shall not exceed the deductible amount.

    22.    The Schedule identifies a $3 million deductible applicable to "property damage" that applies on a "per occurrence" basis.

    23.    The Amendment of Other Insurance Endorsement further provides:

**b. Excess Insurance**

This insurance is excess over any of the other insurance whether primary, excess, contingent or on any other basis:

(1)    Unless such insurance is specifically purchased to apply as excess of this policy, or

(2)    you are obligated by contract to provide primary insurance.

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

## THE SALE

24.     On information and belief, prior to December 22, 2015, Cliffs was engaged in the coal mining business through its wholly owned subsidiary, SNAC.

25.     On information and belief, SNAC in turn owned Pinnacle and Oak Grove Land Resources Company ("Oak Grove").

26.     On information and belief, Pinnacle owned and operated a coal mine in Wyoming County, West Virginia (the "Pinnacle Mine")

27.     On information and belief, Oak Grove owned and operated a coal mine in Jefferson County, Alabama (the "Oak Grove Mine").

28.     Effective December 22, 2015, Cliffs sold the stock of SNAC to Seneca.

29.     As consideration for SNAC, Seneca agreed to assume the liabilities of SNAC and its subsidiaries, including Pinnacle and Oak Grove.

30.     Seneca further agreed to dismiss Cliffs from all pending litigation involving their operations.

31.     The sale agreement did not assign to Seneca Cliffs' insurance policies or any rights under its insurance policies.

32.     Instead, Seneca undertook the obligation to defend and pay judgments and settlements in pending litigation.

## THE BLUESTONE ACTION

33.     On July 7, 2016, Bluestone filed its original complaint in the Bluestone Action against Pinnacle and third-party Target Drilling Company ("Target").

27

34.     The original complaint in the Bluestone Action contained the following allegations:

a.  Bluestone owned a coal mine directly above the Pinnacle Mine (the "Double-Bonus Mine").

b.  In early 2013, Pinnacle sought to install a vertical dewatering system in the Pinnacle Mine.

c.  The vertical dewatering system included a vertical borehole shaft connecting the Pinnacle Mine to the surface. As designed, the borehole shaft ran through the Double-Bonus Mine.

d.  Pinnacle retained Target to drill the borehole shaft, and Target did so, beginning in June 2013.

e.  In March 2015, Bluestone discovered flooding in the Double-Bonus Mine.

f.  Due to the flooding, Bluestone was forced to close the Double-Bonus Mine.

g.  Bluestone's subsequent investigation concluded that the flood was caused by Pinnacle and Target's improper installation of the borehole.

35.     Based on the above-listed allegations, Bluestone asserted counts for negligence, trespass and willful and wanton conduct.

36.     On information and belief, Pinnacle retained Steptoe & Johnson to defend it in the Bluestone Action.

37.     On March 23, 2017, Bluestone filed its first amended complaint in the Bluestone Action, a true and correct copy of which is attached hereto as Exhibit C.

38.     The First Amended Complaint added Cliffs, Seneca and SNAC as defendants.

39.     The First Amended Complaint alleged that Cliffs was liable to Bluestone for damages caused by the borehole because, prior to December 22, 2015, Cliffs operated as Pinnacle's alter ego.

40.     The First Amended Complaint alleged that Seneca was liable to Bluestone for damages caused by the borehole because: (1) Seneca had assumed Pinnacle's liabilities in the December 22, 2015 sale agreement, and (2) beginning December 22, 2015, Seneca operated as

Pinnacle's alter ego and continued Pinnacle's wrongful conduct, including continuing trespass into the Bluestone Mine.

41.     Cliffs tendered its defense to National Union under the 2014-15 Cliffs Policy, and National Union agreed to defend it.

## THE DEFENSE COST DISPUTE WITH PINNACLE

42.     On information and belief, on January 31, 2018, Mission Coal was formed through a reorganization that combined and consolidated the operations of Seneca and affiliated company, Seminole Coal Resources.

43.     Seneca thereafter retained New York law firm, White & Case, to defend Seneca in the Bluestone Action.

44.     Seneca agreed to pay White & Case rates ranging from $510 per hour (for a junior associate) to $1,175 per hour (for a senior partner) to defend Seneca in the Bluestone Action.

45.     In a letter dated March 9, 2018, White & Case tendered Pinnacle's defense and indemnity in the Bluestone Action to National Union.

46.     In April 2018, White & Case tendered Pinnacle's defense and indemnity in the Bluestone Action to Target's insurers, Arch Insurance Company ("Arch") and American Guarantee & Liability Insurance Company ("Zurich"), asserting Pinnacle qualified as an additional insured under Target's policies.

47.     On May 15, 2018, three White & Case attorneys (one from New York and two from Los Angeles) entered an appearance in the Bluestone Action on behalf of Seneca and SNAC.

48.     No White & Case attorney entered an appearance on behalf of Pinnacle.

49.     On June 6, 2018, Zurich agreed to defend Pinnacle in the Bluestone Action.

50.     Zurich retained Douglas LasSota of Marshall Dennehey to defend Pinnacle in the

Bluestone Action, and Mr. LaSota subsequently fulfilled this obligation.  Attached as Exhibit D is a true and correct copy of Zurich's letter to Pinnacle accepting its defense.

51.     On June 27, 2018, Arch also agreed to participate in Pinnacle's defense in the Bluestone Action.  Attached as Exhibit E is a true and correct copy of Arch's letter to Pinnacle accepting its defense.

52.     On August 17, 2018, National Union advised Pinnacle that it had "no current obligation to defend Pinnacle" in the Bluestone Action because the Cliffs Policies were excess coverage provided by Arch and Zurich, both of which had already agreed to defend Pinnacle in the Bluestone Action.

53.     National Union reserved its rights with respect to indemnity and requested additional information so that it could evaluate whether it had any obligation to contribute to the settlement.

54.     On August 20, 2018, White & Case disputed National Union's coverage position with respect to defense, asserting that neither Arch nor Zurich were fully defending Pinnacle. White & Case asserted that its invoices remained unpaid and counsel retained by Zurich was "conflicted."

## THE SETTLEMENT

55.     Around the same time, White & Case advised National Union that a settlement conference was scheduled before the trial judge on October 2, 2018 and requested that National Union contribute to settlement of the Bluestone Action.

56.     White & Case provided National Union with expert reports and other discovery from the Bluestone Action so that National Union could evaluate its indemnity obligations, if any.

57.     National Union evaluated the information provided by White & Case and

determined that, after exhaustion of other available coverage, the claims against Pinnacle were potentially covered under the 2014-15 Cliffs Policy.

58.     In September 2018, National Union advised White & Case that it had paid part of the 2014-15 Cliffs Policy's limit to defend Cliffs but would contribute the remaining limit for the 2014-15 Policy to any settlement in the Bluestone Action.

59.     Beginning October 2, 2018, the parties and their insurers attended a settlement conference before Judge Johnston.

60.     On October 2, 2018, National Union's representatives met with Judge Johnston. They advised him that the 2014-15 Cliffs Policy had a $3 million limit that applied to both defense costs and indemnity; that the $3 million limit had been eroded by National Union's defense of Cliffs in the Bluestone Action; and that they believed the remaining limit was approximately $2.9 million.   They agreed that National Union would pay the "remaining limit"—i.e., the portion remaining after Cliffs' defense costs had been paid—toward the settlement.   Judge Johnston then released National Union's representatives from the conference.

61.     Pinnacle was advised of, and consented to, National Union's agreement to pay its "remaining limit" and understood this "remaining limit" of the 2014-15 Cliffs Policy would be paid in lieu of defense costs under the 2014-15 Cliffs Policy.

62.     Pinnacle further understood, based on its conversations with National Union and Bluestone that had National Union paid Pinnacle's defense costs under the 2014-15 Cliffs Policy, those defense costs would have eroded the available limit for settlement to less than $1 million, and the case would not have settled.

63.     On October 3, 2018, the Bluestone Action settled.   The terms were placed on the record, and Joshua Berman of White & Case made the following statement describing the

settlement:

> In that event, Judge, in exchange for full releases in both directions, the defendants have agreed to pay -- to make an aggregate payment with some components to be paid over time, as I will describe, of $12.15 million dollars to Plaintiff Bluestone, as well as to convey certain rights in an area approximate to the Pinnacle mine known as the "four seam". If we need a further description on the record, I will have to ask my client to do that. For its part, Pinnacle will be paying $1 million dollars at the time the settlement documentation is executed; an additional $1 million dollars on March 31st, 2019; and a final $2 million dollars on June 30th of 2019. It's my understanding that our co-defendant, Cliffs, will be making a payment simultaneous with the execution of the relevant documentation of $1 million dollars. It's likewise my understanding that the Zurich insurer will be making a payment of $1 million dollars, which is its policy limit; ***that AIG will be making a payment of approximately $2.9 million -- I think it's $2.9 -- well, I don't have the number in front of me, which is the balance of its policy;*** and that Chubb will be making a payment of $3 million dollars coincident with the execution of the relevant releases in the various directions; and, finally, that Arch will be making a payment, also coincident with the execution of the relevant documentation, of $250,000.00. I believe that summarizes the terms of the settlement that we've arrived at.

(emphasis added).  A true and correct copy of the transcript is attached hereto as Exhibit F.

64.     Pinnacle's counsel agreed to draft a settlement agreement and circulate to all parties.

## THE BANKRUPTCY

65.     Pinnacle's counsel never circulated a draft settlement agreement.

66.     On October 14, 2018, Mission Coal, Seneca, SNAC and Pinnacle (collectively, the "Debtors") filed for bankruptcy.

67.     The Debtors' bankruptcy petition initiated an automatic stay applicable to the Debtors' assets, and the insurers, including National Union, were unwilling to make payment under the settlement agreement for fear of violating the automatic stay.

68.     On December 7, 2018, Bluestone filed a motion to lift the automatic stay to allow

it to enforce the settlement agreement against the non-debtors, Cliffs and the insurers.  The motion

stated in relevant part that National Union agreed to pay $2.9 million per the parties' settlement

agreement and requested the court's permission to enforce the settlement against it.

69.     On January 30, 2019, Pinnacle advised National Union for the first time that

National Union was required to reimburse it for defense costs before contributing its "remaining

limit" to the Bluestone Action.

70.     On January 31, 2019, the Debtors opposed the motion to lift the automatic stay.

The Debtors asserted that enforcement would prejudice the Estate because National Union's policy

limit of $3 million applied to *both* defense costs and indemnity.  If National Union paid $2.9

million to Bluestone for indemnity, there would be no further policy limit left to reimburse defense

costs.

71.     On March 5, 2019, the Debtors and Bluestone reached a compromise that left the

stay in place through April 12, 2019 but permitted Bluestone to enforce the settlement against the

non-debtor parties thereafter.   The bankruptcy court entered an agreed order reflecting the

compromise, which provided that:

> [T]he United States District Court for the Southern District of West
> Virginia shall have exclusive jurisdiction to resolve all issues related
> to the settlement agreement except for any claim directly against the
> Debtors arising from the settlement agreement and any claims by
> the Debtors against any insurer that do not erode or reduce the
> Movants' right to recover $8,160,000 under the Settlement
> Agreement from non-Debtor parties  and insurers.

a true and correct copy of which is attached hereto as Exhibit G.

## THE MOTION TO ENFORCE SETTLEMENT

72.     On April 12, 2019, Bluestone moved to enforce the settlement in the Bluestone

Action.

73.     Debtors received a copy of the motion but did not file opposition papers or

otherwise respond to the motion.

74.     On April 23, 2019, National Union filed a response.  The response explained that National Union had not yet paid its remaining policy limit to Bluestone as per the settlement agreement because, after filing for bankruptcy, Pinnacle had taken the position that National Union was required to reimburse it for $2 to $3 million in defense costs before contributing to settlement. The response further explained that the remaining limit of the 2014-15 Cliffs Policy was insufficient to satisfy both the $2.9 million demanded by Bluestone and the $2 to $3 million in defense costs demanded by Pinnacle.  The response requested the Court's guidance.

75.     Debtors received a copy of National Union's filing but did not file opposition papers or otherwise respond to the statement.

76.     On April 24, 2019, the Court held a telephonic status conference regarding the motion.

77.     Debtors were notified of the status conference but did not announce their appearance on the call.

78.     On information and belief, counsel or representatives for one or more Debtors was in fact on the call.

79.     At the hearing, the Court expressed frustration that the insurers had not paid Bluestone the amounts promised at the October settlement conference.

80.     Based on the Court's comments and Pinnacle's failure to object to the motion, National Union agreed to pay Bluestone $2.9 million under the 2014-15 Cliffs Policy.

81.     On May 10, 2019, National Union paid $2.9 million to Bluestone under the 2014-15 Cliffs Policy.

## THE OAK GROVE PLAINTIFFS

82.     On May 24, 2019, Robert Jones, Angelo Webster, Clarence Oates, and David Cross (the "Oak Grove Plaintiffs") filed a lawsuit against National Union in the Circuit Court of Jefferson County, Alabama (the "Alabama Coverage Action").

83.     The Oak Grove Plaintiffs alleged that National Union was obligated to indemnify them under the 2013-14 Cliffs Policy for a $3 million settlement reached in an underlying action captioned *Webster v. Oak Grove Resources, LLC*, No. 01-CV-2015-900456, filed in the Circuit Court of Jefferson County, Alabama (the "Oak Grove Action").

84.     The Oak Grove Action arose out of an October 18, 2013 accident at the Oak Grove Mine, while the 2013-14 Cliffs Policy was in effect.  Two trains crashed on the one-way portion of track inside the Oak Grove Mine.  Plaintiffs allegedly suffered bodily injury as a result of the crash.

85.     In February 2015, the Oak Grove Plaintiffs sued SNAC and Oak Grove for their alleged injuries.

86.     In December 2015, while the action was pending, Cliffs sold SNAC and Oak Grove to Seneca.  Seneca agreed to assume their defense in the Oak Grove Action to pay any subsequent settlement or judgment without contribution from Cliffs' insurers.

87.     On information and belief, Seneca settled the Oak Grove Action in February 2018 for $3 million without National Union's involvement.

88.     Thereafter, Seneca failed to make the payments in accordance with the terms of the settlement agreement.

89.     On October 14, 2018, Seneca and its subsidiaries filed for bankruptcy.

90.     After a plan was confirmed in the bankruptcy court, the Oak Grove Plaintiffs sued National Union for coverage under the 2013-14 Cliffs Policy.

91.     The Alabama Coverage Action was dismissed without prejudice on February 20, 2020 but has been refiled and is currently captioned, *Jones v. National Union Fire Insurance Company of Pittsburgh, Pa.*, Case No. 01-CV-2020-901949 in the Circuit Court of Jefferson County, Alabama.

92.     The operative complaint seeks $900,000 from National Union under the 2013-14 Cliffs Policy.

## THE DEBTORS' DEMAND

93.     Shortly after the Oak Grove Plaintiffs filed the Alabama Coverage Action against National Union, the Debtors demanded that National Union reimburse them for amounts they paid to Steptoe & Johnson and White & Case in the Bluestone Action.

94.     National Union reiterated is coverage position regarding defense, *see supra* ¶ 52, informed the Debtors that the 2014-15 Cliffs Policy had been exhausted in the Bluestone Settlement, and advised the Debtors that the 2013-14 Cliffs Policy was subject to claims by the Oak Grove Plaintiffs that, if covered, may take precedence over the Debtors' claims for coverage.

95.     In an attempt to resolve the dispute without litigation, National Union nonetheless requested copies of invoices for which Debtors sought reimbursement along with proof that Pinnacle had paid, or was liable to pay, such defense costs.

96.     In response, Debtors transmitted invoices totaling over $6 million to National Union for review.

97.     The majority of the remaining invoices related to a years-old contract dispute between Cliffs and Seneca for economic damages, of which National Union had never been placed on notice by any party.

98.     Only approximately $2 million related to the Bluestone Action.

99.     The information provided further suggested that the approximately $2 million invoiced for work in the Bluestone Action had been paid to protect Seneca's interests, not Pinnacle's interests.

100.    This included evidence that Seneca, not Pinnacle, had paid a portion of the White & Case's invoices, and the unpaid portions of the invoices were listed as Seneca's debt in the bankruptcy schedules filed with the petition.

101.    National Union advised the Debtors that Seneca was not an insured under the Cliffs Policies and, on multiple occasions between June and September 2019, requested evidence that Pinnacle had paid, or was liable to pay, such costs.

102.    No such information was ever provided.

103.    On April 30, 2020, Mission Coal filed this action for declaratory relief, asserting claims for alleged breach of contract and alleged violation of West Virginia's Unfair Trade Practices Act.

## COUNT I
### (Mission Coal Is Not an Insured)

104.    National Union realleges the allegations contained in paragraphs 1 to 103 herein.

105.    Section II of the Cliffs Policies define "insured" as the named insured on the Cliffs Policies' Declarations Page, Cliffs.

106.    By endorsement, "named insured" is expanded to include Cliffs' subsidiaries and joint-ventures, but only to the extent such subsidiaries or joint-ventures are disclosed to National Union prior to the Cliffs Policies' effective date.

107.    Mission Coal was not a subsidiary, associated, affiliated, allied or acquired company or corporation of which Cliffs had more than 50% ownership interest in or exercised management or financial control as of the Cliffs Policies' effective dates.

108.    Mission Coal was not in a joint venture with Cliffs as of the Cliffs Policies' effective dates.

109.    Mission Coal was not assigned rights under the Cliffs Policies by Cliffs in connection with the December 22, 2015 sale of Cliffs' coal operations to Seneca.

110.    National Union did not consent to any assignment by Cliffs to Mission Coal of rights under the Cliffs Policies in connection with the December 22, 2015 sale of Cliffs' coal operations to Seneca or otherwise.

111.    On information and belief, Mission Coal disputes one or more of the allegations set forth in paragraphs 1 to 110, and therefore, there is a justiciable controversy.

112.    Wherefore, National Union is entitled to a declaration under 28 U.S.C. § 2201 that Mission Coal is not an insured or otherwise entitled to rights under the Cliffs Policies.

## COUNT II
### (Seneca Is Not an Insured)

113.    National Union realleges the allegations contained in paragraphs 1 to 113 herein.

114.    Section II of the Cliffs Policies define "insured" as the named insured on the Cliffs Policies' Declarations Page, Cliffs.

115.    By endorsement, "named insured" is expanded to include Cliffs' subsidiaries and joint-ventures, but only to the extent such subsidiaries or joint-ventures are disclosed to National Union prior to the Policies' effective dates.

116.    Seneca was not a subsidiary, associated, affiliated, allied or acquired company or corporation of which Cliffs had more than 50% ownership interest in or exercised management or financial control as of the Cliffs Policies' effective dates.

117.    Seneca was not in a joint venture with Cliffs as of the Cliffs Policies' effective dates.

118.     Seneca was not assigned rights under the Cliffs Policies by Cliffs in connection with the December 22, 2015 sale of Cliffs' coal operations to Seneca.

119.     National Union did not consent to any assignment by Cliffs to Seneca of rights under the Cliffs Policies in connection with the December 22, 2015 sale of Cliffs' coal operations to Seneca or otherwise.

120.     On information and belief, Mission Coal disputes one or more of the allegations set forth in paragraphs 1 to 120, and therefore, there is a justiciable controversy.

121.     Wherefore, National Union is entitled to a declaration under 28 U.S.C. § 2201 that Mission Coal is not an insured or otherwise entitled to rights under the Cliffs Policies.

### COUNT III
### (In the Alternative)
### (National Union's Defense Obligations are Excess)

122.     National Union realleges the allegations contained in paragraphs 1 to 121 herein.

123.     The Cliffs Policies provide that they are excess to other insurance whether primary, excess, contingent or otherwise.

124.     They further provide that when excess, National Union has no duty to defend the insured.

125.     During the pendency of the Bluestone Action, Mission Coal, Seneca, SNAC and Pinnacle had other insurance for the Bluestone Action.

126.     The Cliffs Policies therefore applied in excess of this other insurance, and National Union had no duty to defend Mission Coal, Seneca, SNAC or Pinnacle in the Bluestone Action.

127.     On information and belief, Mission Coal disputes one or more of the allegations set forth in paragraphs 1 to 126, and therefore, there is a justiciable controversy.

128.     Wherefore, National Union is entitled to a declaration under 28 U.S.C. § 2201 that

it had no duty to defend Mission Coal, Seneca, SNAC or Pinnacle in the Bluestone Action.

**COUNT IV**
**(In the Alternative)**
**(The 2014-15 Cliffs Policy Is Exhausted)**

129.    National Union realleges the allegations contained in paragraphs 1 to 128 herein.

130.    The 2014-15 Cliffs Policy has a $3 million occurrence limit.

131.    The 2014-15 Cliffs Policy has a $3 million aggregate limit.

132.    The occurrence and aggregate limits of the 2014-15 Cliffs Policy applies to defense costs and indemnity payments.

133.    National Union has paid $3 million in defense costs and indemnity under the 2014-15 Cliffs Policy in the Bluestone Action.

134.    National Union's payments have exhausted the limits of the 2014-15 Cliffs Policy, and therefore National Union has no further obligation for defense or indemnity under the 2014-15 Cliffs Policy.

135.    Mission Coal and its subsidiaries waived, or are estopped from disputing, that National Union's contribution to the Bluestone settlement exhausted the 2014-15 Cliffs Policy because, after agreeing that issues related to settlement should be resolved in this Court, Mission Coal and/or its subsidiaries failed to raise any objection to Bluestone's Motion to Enforce.

136.    National Union was therefore left without any basis to contest Bluestone's Motion, and National Union relied on Mission Coal and/or its subsidiaries failure to object to the Motion when it paid $2.9 million to settle the Bluestone Action.

137.    National Union made payment to Bluestone in reliance Pinnacle's failure to object to the Motion to Enforce.

138.    On information and belief, Mission Coal disputes one or more of the allegations set

forth in paragraphs 1 to 137, and therefore, there is a justiciable controversy.

139.    Wherefore, National Union is entitled to a declaration under 28 U.S.C. § 2201 that that the 2014-15 Cliffs Policy is exhausted and National Union has no further obligation to pay any defense costs associated with the Bluestone Action.

## COUNT V
### (In the Alternative)
### (Impairment of the 2013-14 Cliffs Policy)

140.    National Union realleges the allegations contained in paragraphs 1 to 139 herein.

141.    The 2013-14 Cliffs Policy has a $3 million occurrence limit.

142.    The 2013-14 Cliffs Policy has a $3 million aggregate limit.

143.    The occurrence and aggregate limits of the 2013-14 Cliffs Policy applies to defense costs and indemnity payments.

144.    National Union has paid counsel defend Cliffs in the Bluestone Action under the 2013-14 Cliffs Policy and may have also paid defense or indemnity for other lawsuits under the same Policy.

145.    Those payments have eroded or impaired the limits of the 2013-14 Cliffs Policy.

146.    The Oak Grove Plaintiffs assert a right to an additional $900,000 under the 2013-14 Cliffs Policy.

147.    If covered under the 2013-14 Cliffs Policy, the $900,000 sought by the Oak Grove Plaintiffs must be paid before any additional defense costs from the Bluestone Action.

148.    If paid, those amounts will further erode, impair or exhaust the limits of the 2013-14 Cliffs Policy.

149.    On information and belief, Mission Coal disputes one or more of the allegations set forth in paragraphs 1 to 146, and therefore, there is a justiciable controversy.

150.    Wherefore, National Union is entitled to a declaration under 28 U.S.C. § 2201 that, to the extent Mission Coal is entitled to reimbursement for defense costs incurred in the Bluestone Action under the 2013-14 Cliffs Policy, Mission Coal's recovery is capped at available policy limits.

**WHEREFORE,** National Union requests this Court declare as follows:

(1) Mission Coal is not an insured under the Cliffs Policies and does not otherwise have rights under the Cliffs Policies;

(2) Seneca is not an insured under the Cliffs Policies and does not otherwise have rights under the Cliffs Policies;

(3) National Union did not have a duty to Pinnacle in the Bluestone Action because the Cliffs Policies applied to the Bluestone on an excess basis;

(4) National Union does not have a duty to reimburse defenses costs incurred in the Bluestone Action under the 2014-15 Cliffs Policy because the applicable limits are exhausted;

(5) National Union's duty to reimburse defense costs incurred in the Bluestone Action is limited to the remaining portion of the applicable limit after accounting for Cliffs' defense costs and, if covered, the Oak Grove Plaintiffs' claims; and

(6) Any other relief this Court deems just and proper.

/s/ *Robert J. D'Anniballe, Jr., Esq.*
Robert D'Anniballe, Jr., Esquire
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
333 Penco Road
Weirton, WV 26062
Phone (304) 723-0220
Fax (304) 723-6318
RJD@Pietragallo.com
*Counsel for National Union Fire Insurance*
*Company of Pittsburgh, Pa.*

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| MISSION COAL WIND DOWN CO., LLC    )<br>                                                              )<br>                         Plaintiff,          )<br>                                                              )<br>                         vs.                      )<br>                                                              )<br>NATIONAL UNION FIRE INSURANCE     )<br>COMPANY OF PITTSBURGH, PA, and     )<br>AMERICAN GUARANTEE AND             )<br>LIABILITY INSURANCE COMPANY,       )<br>                         Defendants.        )<br>                                                              ) | Case No.  2:20-cv-00302 |

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2020, I electronically filed the foregoing NATIONAL UNION'S ANSWER AND AFFIRMATIVE DEFENSES TO MISSION COAL'S COMPLAINT AND COUNTERCLAIM FOR DECLARATORY RELIEF with the Clerk of the Court using the Court's authorized CM/ECF system, which will send notification and provide access to such filing to all counsel of record.

/s/ Robert J. D'Anniballe, Jr., Esq.
Robert D'Anniballe, Jr., Esquire
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
333 Penco Road
Weirton, WV 26062
Phone (304) 723-0220
Fax (304) 723-6318
RJD@Pietragallo.com
*Counsel for National Union Fire Insurance*
*Company of Pittsburgh, Pa.*

43