THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | | |
|---|---|---|
| MISSION COAL WIND DOWN CO., LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:20-cv-00302 |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, and | ) | |
| AMERICAN GUARANTEE AND | ) | |
| LIABILITY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF MISSION COAL WIND DOWN CO., LLC'S MEMORANDUM IN OPPOSITION TO INSURERS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Mission Coal Wind Down Co., LLC ("Mission Coal") submits this memorandum in opposition to the Insurer Defendants' Motion for Judgment on the Pleadings (the "Motion").

## I.    INTRODUCTION

In this coverage action, the Insurers have failed to fulfill their defense obligations and have refused to pay defense costs that were incurred in representing Pinnacle Mining Company, LLC ("Pinnacle") in the *Bluestone* Action.  The Insurers do not dispute that the *Bluestone* Action constitutes a covered claim under their policies.  Instead, they assert that neither Mission Coal nor Seneca Coal Resources, LLC ("Seneca") have rights under their policies.  But the Insurers mischaracterize the relief that is sought in the complaint.  The Insurers have failed to pay defense costs incurred on behalf of Pinnacle in the *Bluestone* Action.  Whether or not Mission Coal or Seneca Coal Resources, LLC ("Seneca") constitute insureds under the Policies is of no

consequence.  The defense costs at issue were incurred on behalf of Pinnacle in the *Bluestone* Action, and are amounts currently owed to Mission Coal because Pinnacle filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and assigned its rights to Mission Coal.[1]  Nathan Decl.[2] at ¶¶ 3-6.

Cliffs Natural Resources, Inc. ("Cliffs") was formerly the parent company and owner of Cliffs North American Coal, LLC ("CNAC"), which in turn was the owner of Pinnacle.  On December 22, 2015, Seneca became Pinnacle's parent company.  Pursuant to the Unit Purchase Agreement, the deal was structured as a "stock purchase" transaction, not an asset purchase.[3] Accordingly, Pinnacle became a wholly owned subsidiary of Seneca, but otherwise retained its separate corporate existence.  Pinnacle did not merge into a new company, and it remained insured under the Insurers' policies.

Seneca acquired not only the Pinnacle Mining Complex, but all of the equity interests in Pinnacle – in other words, Seneca did not acquire just a line of Pinnacle's business, but instead acquired all of Pinnacle's stock, and Pinnacle continued to exist as the same corporate entity after ownership was transferred from Cliffs to Seneca.[4]  While Pinnacle's ownership changed, the rights it possessed as an insured under the National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") and American Guarantee and Liability Insurance Company

---

[1] Mission Coal Company, LLC, along with Pinnacle Land Company, LLC, Pinnacle Mining Company, LLC, Seneca Coal Resources, LLC, and Seneca North American Coal, LLC (collectively, the "Debtors"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

[2] Declaration of Gilbert Nathan, dated November 13, 2020.

[3] Even if the transaction was not a stock purchase, the surviving entity remained Pinnacle, an insured under Insurers' policies, and the Insurers have not proven otherwise.

[4] Insurers argue that "Cliffs transferred to Seneca only its coal mining operations and remained in a number of other lines of business."  Motion at 16.  This argument misses the mark.  What matters is that Cliffs transferred ownership of Pinnacle to Seneca.  Pinnacle's corporate structure did not change, and therefore its coverage rights also did not change.

("AGLIC") insurance policies did not change because it remained the same corporate entity that was insured under the policies prior to the transaction.  The very fact that National Union and AGLIC contributed to the *Bluestone* Action settlement on Pinnacle's behalf, and paid certain defense costs on Pinnacle's behalf, evidences that the Insurers recognized Pinnacle's insured status under their policies, ***even after*** Pinnacle's ownership was transferred from Cliffs to Seneca, and ***even after*** Target Drilling, Inc. ("Target") was dismissed from the *Bluestone* Action.

Pinnacle was a defendant in the *Bluestone* Action,  and was represented by three law firms: Steptoe & Johnson ("Steptoe"), White and Case LLP ("W&C") and Marshall, Dennehey, Warner, Coleman & Goggin ("Marshall Dennehey").  As set out in the Complaint, however, in breach of their good faith duties under the policies, Insurers have refused to pay the Steptoe and W&C invoices despite their contractual obligations to do so and the Insurers' Motion should be denied because Mission Coal (as the entity that was assigned Pinnacle's rights in the bankruptcy) has properly alleged facts entitling it to the relief sought.

## II.     UNDISPUTED FACTS

### A.     The *Bluestone* Action

On July 7, 2016, Bluestone Coal Corporation ("Bluestone) and the Double-Bonus Mining Company ("Double-Bonus") filed a civil action against Pinnacle and Target for damages arising out of the flooding and ultimate closure of Mine No. 65 in United States District Court, Southern District of West Virginia, Charleston Division, Case No. 2:16-cv-06098.  On March 23, 2017, Bluestone amended its complaint to include claims against Seneca, SNAC, and Cliffs, among others.  The *Bluestone* Action alleged that Cliffs, Pinnacle and Target, provided personnel, labor, equipment, consultation and other services relating to the borehole well development process at Mine No. 65.  *See* Dkt. No. 10-3 at ¶¶ 8, 9, 20, 51.  Seneca was named solely in its capacity as

Pinnacle's parent corporation. *See id.* at ¶¶ 5, 7, 15(e)-(f), 18-20, 48. The *Bluestone* Action alleged liabilities arising out of flooding that was first discovered in March 2015 (the "Flooding Claims").

On April 24, 2018, Bluestone and Double-Bonus Mining filed a motion for entry of order voluntarily dismissing their claims against Target. Hardiman Decl.,[5] Ex. A. Neither Pinnacle, Seneca, or SNAC were a part of those negotiations, and they filed a limited objection to the motion, so as to be provided time to investigate the terms of the settlement because Target, "the driller of the borehole that allegedly caused approximately $650 million in damages" settled its disputes with Bluestone and Double-Bonus for only $5 million. Hardiman Decl., Ex. B at 2. On May 25, 2018, Target was dismissed from the *Bluestone* Action. The court stated "that such dismissal shall not, and shall not be construed to, prohibit any and all claims by any defendants for direct contractual indemnification against Target, if any." Hardiman Decl., Ex. C.

## B. Pinnacle's Corporate History

As set forth in the Chapter 11 Voluntary Petition Non-Individual in the Mission Coal Wind Down Co., LLC bankruptcy proceedings, No. 18-04177-TOM11 (Bankr. N.D.Al.), the Debtor and Affiliates of the Debtor, including Mission Coal Company, LLC, Pinnacle Land Company, LLC, Pinnacle Mining Company, LLC, Seneca Coal Resources, LLC, and Seneca North American Coal, LLC (collectively, the "Debtors"), successfully moved for joint administration of their petitions in the United States Bankruptcy Court for the Northern District of Alabama for relief under Chapter 11 of title 11 of the United States Court. Nathan Decl. at ¶ 3. Pinnacle Mining Company, LLC was converted to Pinn MC Wind Down, LLC. *Id.* at ¶ 4. Mission Coal Wind Down Co., LLC is the ultimate equity owner, and it is responsible for paying off the Debtors' creditors and

---

[5] Declaration of Alexander D. Hardiman, dated November 13, 2020.

distributing the Debtors' remaining assets.  *Id.* at ¶ 5.  Pinn MC Wind Down, LLC assigned its insurance rights to Mission Coal Wind Down Co., LLC.  *Id.* at ¶ 6.

## C.     Pinnacle's Defense Costs

The Insurers were provided copies of the Steptoe and W&C defense invoices for time, costs and expenses performed for the benefit of Pinnacle.  *See* Dkt. No. 13 at  ¶ 1 ("As a consequence of defendants' breaches, Mission Coal has not been reimbursed for covered defense costs that were incurred by insureds under National Union's and AGLIC's insurance policies – amounts that are now owed to Mission Coal.").  The work was performed for Pinnacle.[6]  Mickum Decl.; Hardiman Decl., Ex.D, at 2 (National Union represented to the Court in the *Bluestone* Action that Pinnacle asserted "that its outstanding, unpaid defense costs (believed to be approximately $2 million) must be reimbursed").  In fact, National Union acknowledges in its counterclaim that Pinnacle retained Steptoe and W&C.  Dkt. No. 13 at ¶ 36; *id.* at 21 ("Mission Coal and/or its subsidiaries Seneca, SNAC and Pinnacle retained Steptoe & Johnson and White & Case to defend them in the Bluestone Action").  Further, Mission Coal admitted in its answer "that Pinnacle retained Steptoe & Johnson.  Pinnacle was also represented by White & Case and Marshall Dennehey Warner Coleman & Goggin."  Dkt. No. 28 at ¶ 36.  Zurich further admits in its counterclaim that W&C was retained as counsel for Pinnacle.  Dkt. No. 10 at ¶¶ 65-67.  Zurich also admits that Steptoe was defending Pinnacle in the *Bluestone* Action.  *Id.* at ¶ 136 ("At that time, John J. Meadows of Steptoe & Johnson PLLC in Charleston, West Virginia was defending Pinnacle in the Bluestone Litigation, and presumably had been during the prior two (2) years that litigation was pending.").

---

[6] In Zurich's counterclaim, it also argues that the legal services were "rendered on behalf of Seneca."  Dkt. No. 10 at ¶ 69.  This is not correct and Mission Coal denied these allegations. Dkt. No. 27 at ¶ 69.

In their Motion however, Insurers erroneously "assert that any remaining costs were attributable to Seneca, which is not an insured under the Policies."  Motion at 6 (citing their respective counterclaims).  This is a disputed issue of fact, and the Insurers' own pleadings do not support this assertion.

As set forth in the attached Declaration by George Mickum, former General Counsel of Seneca Coal Resources, LLC and Mission Coal Company, LLC, the unpaid defense costs were for work that was performed on behalf of Pinnacle.  Mickum Decl.[7] at ¶¶ 3-4.

Mission Coal was assigned Pinnacle's rights, and seeks the payment of approximately $2 million in Pinnacle defense costs, which includes 2017 and 2018 invoices:

- Steptoe: February 24, 2017; March 29, 2017; April 27, 2017; June 15, 2017; July 25, 2017; August 28, 2017; September 26, 2017; November 27, 2017; December 20, 2017; January 25, 2018; February 12, 2018; March 19, 2018; April 26, 2018; May 11, 2018.

- W&C: June 6, 2018; July 20, 2018; August 10, 2018; September 12, 2018.

Hardiman Decl, at ¶ 7.   These defense costs were incurred on behalf of Pinnacle.  Mickum Decl. at ¶ 4.

## D.     Mission Coal's First Amended Complaint

Mission Coal's First Amended Complaint states:

- "As a consequence of defendants' breaches, Mission Coal has not been reimbursed for covered defense costs that were incurred by insureds under National Union's and AGLIC's insurance policies – ***amounts that are now owed to Mission Coal***." Dkt. 32 at ¶ 1 (emphasis added).

- "National Union admitted coverage and contributed to the settlement, but failed to pay outstanding defense costs."  *Id.* at ¶ 51.

- "AGLIC admitted coverage and contributed to the settlement, but failed to pay outstanding defense costs."  *Id.* at ¶ 52.

---

[7] Declaration of George Brent Mickum, dated November 13, 2020.

Mission Coal is seeking the payment of Pinnacle's defense costs, not Seneca's defense costs.

**E.     The Unit Purchase Agreement Was a Stock Purchase that Transferred all Equity Ownership of Pinnacle from Cliffs to Seneca**

Pursuant to the December 22, 2015 Unit Purchase Agreement, Section 2.1 makes clear that the transaction was a stock purchase, not an asset purchase. The Purchaser (Seneca) bought all the Units, which are defined in Recital B as all the outstanding equity interests of CNAC, including Pinnacle and four other subsidiaries of that entity. The Agreement states that Seneca purchased "all of the right, title and interest of Seller in and to the Units [Pinnacle and the other subsidiaries], free and clear of all Liens." Section 2.1. Accordingly, Seneca acquired all of Pinnacle's equity interests – not just the Pinnacle Mining Complex as the Motion appears to imply. *See* Motion at 13. The insured corporate entity Pinnacle remained the same but was then owned by Seneca and no longer by Cliffs.

**F.     The National Union Policies**

Under the National Union Policies, the Complaint alleges that Cliffs is the Named Insured and Pinnacle is an insured:

> National Union provided Cliffs with commercial general liability insurance policies evidencing that it maintained liability insurance under National Union Policy Number 190-31-41 (the "National Union Policy"). The National Union Policy provided Cliffs with commercial general liability insurance coverage for the period of April 15, 2013 through April 15, 2015. The National Union Policy provided Cliffs *and Pinnacle* with coverage for liabilities arising out of the *Bluestone* Action and as a result of the sale and transfer of all relevant Cliffs assets to Mission Coal, in return for assuming all Cliffs liabilities, Mission Coal was transferred the rights of the insurance policy by operation of law and/or contract.

Dkt. No. 32 at ¶ 26 (emphasis added). Mission Coal itself does not have rights under the policies, but rather because of the corporate history and bankruptcy, Mission Coal is the entity that brings this coverage action on behalf of Pinnacle by assignment. Nathan Decl.

7

### 1.    Pinnacle is a Named Insured

Importantly however, National Union does not dispute that Pinnacle is an insured under its policy, and has affirmatively represented in other court proceedings that Pinnacle is a named insured under the Cliffs 2014-2015 Policy.  Hardiman Decl., Ex. D, at p. 1.  In the *Bluestone* Action, National Union represented to the Court that "Cliffs and its former subsidiary, ***Pinnacle*** Mining Company ("Pinnacle"), ***are named insureds*** under" "policy no. GL 190-31-41 issued to Cliffs Natural Resources, Inc. ("Cliffs") for the period from April 15, 2014 to April 15, 2015[.]" [8] *Id.* (Emphasis added).  It is undisputed that Pinnacle was an insured under the National Union Policy and remained an insured under the National Union Policy after Seneca acquired ownership of Pinnacle through the stock purchase.

### 2.    The Deductible Coverage Endorsement Does Not Affect Pinnacle's Rights under the National Union Policies

In the Motion, National Union also relies on the "Deductible Coverage Endorsement" affixed to the National Union Policies (the "Deductible Endorsement"), and argues that the "Cliffs Policies are fully fronted, and Cliffs is obligated to reimburse National Union for any amounts National Union pays to Seneca under the Policies."  Motion at 17.  The Deductible Endorsement is clear however, in that it only applies to Cliffs and National Union, and not to Pinnacle.  *See* Dkt. No. 10-4 at 72 ("This Endorsement applies solely between you and us.  It does not affect the rights of others under this policy.").  In any event, the obligations between Cliffs and the insurers are irrelevant, and do not change the fact that Pinnacle is entitled to coverage for defense costs.

### G.    The AGLIC Policy

The Complaint alleges that Target is the Named Insured and Pinnacle is an additional insured under the AGLIC Policy Number GLO 9226057-04 (the "AGLIC Policy"):

---

[8] Coverage afforded under the 2013/2014 policy is not materially distinguishable.

> AGLIC provided Target with an umbrella liability insurance policy evidencing that it maintained liability insurance under AGLIC Policy Number GLO 9226057-04 (the "AGLIC Policy"). The AGLIC Policy provided Target with umbrella liability insurance coverage for the period of June 1, 2014 through June 1, 2015. The AGLIC Policy provided Target with coverage for liabilities arising out of the *Bluestone* Action because the underlying Arch Insurance Company policy exhausted and AGLIC's coverage was thereby triggered. The AGLIC Policy ***provided Pinnacle*** with coverage for liabilities arising out of the *Bluestone* Action as an additional insured.

Dkt. No. 32 at ¶ 27 (emphasis added). AGLIC admits that Target is the Named Insured under the AGLIC Policy, but inexplicably denies the remaining allegations. Dkt. No. 37 at ¶ 27.

The AGLIC Policy is excess to the Arch 2014/2015 Policy (the "Arch Policy"), and "follows form" (i.e. adopts the terms and conditions of the underlying Arch Policy). Under the Arch Policy, an entity required under a written contract to be named as an additional insured, is an insured under the policy. The Arch Policy's Blanket Additional Insured Endorsement states:

> **SECTION II - WHO IS AN INSURED** is amended to include as an additional insured those persons or organizations who are required under a written contract with you to be named as an additional insured, but only with respect to liability for "bodily injury", "property damage", or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of your subcontractors:
>
> **a.** In the performance of your ongoing operations or "your work", including "your work" that has been completed; or
>
> **b.** In connection with your premises owned by or rented to you.
>
> All other terms and conditions of this Policy remain unchanged.

Dkt. No. 10-6 at 20 of 60. The AGLIC Policy adopts this provision, stating that "Insured means":

> Any person or organization qualifying as an additional **insured in** [the Arch Policy] but only to the same extent that such person or organization is an additional **insured** under [the Arch Policy].

Dkt. No. 10-8 at 9 of 56. Accordingly, if Pinnacle was required by contract to be named as an additional insured under Target's insurance, pursuant to these provisions Pinnacle would be an insured under the AGLIC policy.

9

**H.      Target was Contractually Required to Name Pinnacle as an Additional Insured**

Pinnacle provided AGLIC the written contract which required Target to name Pinnacle as an additional insured, and Zurich in fact attaches that contract to its Counterclaim.  *See* Dkt. Nos. 10-2, 10-11.  The contract between Pinnacle (Buyer) and Target Drilling Inc. (Supplier/Seller), states:

> PURCHASE ORDER IS DELIVERED SUBJECT TO BUYER'S TERMS AND CONDITIONS FOUND AT: WWW.CLIFFSNATURALRESOURCES.COM/ TERMSANDCONDITIONS WHICH SELLER CONFIRMS HAVING READ AND UNDERSTOOD.  SELLER AGREES THAT ITS ACCEPTANCE OF THE PURCHASE ORDER, WHETHER EXPLICITLY OR IMPLICITLY, INCLUDING THROUGH THE DELIVERY OF ANY PRODUCT OR THE PERFORMANCE OF ANY SERVICES SPECIFIED IN THIS PURCHASE ORDER, ***SHALL CONSTITUTE SELLER'S IRREVOCABLE AND UNCONDITIONAL CONSENT FOR THIS TRANSACTION TO BE BOUND BY SUCH GENERAL TERMS AND CONDITIONS*** AND THAT SUCH TERMS ARE INCORPORATED INTO THIS PURCHASE ORDER BY REFERENCE.

Dkt. No. 10-2 at p. 3 of 10 (emphasis added).  The "BUYER'S TERMS AND CONDITIONS" incorporated by reference into the contract make clear that Target is contractually obligated to include Pinnacle as an additional insured under its commercial general liability insurance:

> **Insurance:** Seller shall procure and maintain appropriate insurance coverage meeting or exceeding the following requirements, as well as all jurisdictional and legal mandates: (a) <u>Commercial General Liability</u>: Commercial General Liability Insurance, including contractual liability, premises liability, on-going operations liability, completed operations liability, contractors protective liability, personal injury, broad form property damage with minimum limits of $2,000,000 per occurrence (all currency noted in U.S. dollars). The policy shall be endorsed to include Buyer as an additional insured on a primary and non-contributory basis with respect to any insurance or self-insurance maintained by any of them.

Dkt. No. 10-11, at ¶ 17.  Accordingly, because the contract between Pinnacle and Target requires Target to add Pinnacle to its CGL insurance, pursuant to the AGLIC policy provisions set forth above, Pinnacle is an additional insured under the AGLIC Policy.  AGLIC has wrongly taken the position that the general terms and conditions do not apply, because they post-date the contract.

10

Dkt. No. 27 at ¶ 41. The contract explicitly incorporates the terms and conditions, and at minimum, whether the contract incorporates the terms and conditions attached at Dkt. No. 10-11 is an issue of fact that cannot be decided on a motion for judgment on the pleadings.

Indeed, by letter dated June 6, 2018, AGLIC itself admitted that Pinnacle could qualify as an "insured" under the Coverage A – Excess Follow Form Liability Insurance of the AGLIC 2014-2015 Umbrella Policy. Dkt. No. 13-4. Thus, citing Arch's Blanket Additional Insured Endorsement set forth above, AGLIC stated, "Pinnacle may qualify as an 'insured' under the Arch 2014-15 CGL Policy . . . ." *Id.* Yet now, it denies Pinnacle's status as an additional insured in its answer to the Complaint. Dkt. No. 37 at ¶ 97, 100, 102.

## III.    LEGAL ARGUMENT

### A.    Standard of Review

"The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 1367 (3d ed. 2004). "[I]f the pleadings do not resolve all of the factual issues in the case, proceeding with discovery and potentially a trial on the merits would be more appropriate than an attempt at resolution of the case on a Rule 12(c) motion." *Id.* "Therefore, '[u]nder Rule 12, judgment will not be granted unless the movant clearly establishes that ***no material issue of fact remains to be resolved*** and that he is entitled to judgment as a matter of law.'" *Jeffers v. Wal-Mart Stores, Inc.*, 84 F. Supp. 2d 775, 777 (S.D.W. Va. 2000) (citation omitted) (emphasis added). It "should only be granted if, after accepting all the well-pleaded allegations in the complaint and construing them in the light most favorable to the non-moving party, ***it appears certain that the plaintiff cannot prove any set of facts that would entitle the plaintiff to relief.***" *Graham v. Star USA Fed. Credit Union*, No. 2:18-CV-00432, 2018 WL 4854665, at *2 (S.D.W. Va. Oct. 5,

11

2018), reconsideration denied, No. 2:18-CV-00432, 2019 WL 637714 (S.D.W. Va. Feb. 14, 2019) (emphasis added).  Material issues of fact remain to be resolved, and Insurers' Motion should be denied.

**B.     Duty To Defend**

It is well established under West Virginia law that an insurer's duty to defend is broader than its duty to indemnify.  Under West Virginia law, a liability insurer's "duty to defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." *Aetna Cas. & Sur. Co. v. Pitrolo*, 342 S.E.2d 156, 160 (W.Va. 1986) (citations omitted).  "[A]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." *Id.*  The complaint need not "specifically and unequivocally make out a claim within the coverage." *Id.*  A duty to defend is broader than a duty to indemnify. *Id.* ("[I]t is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy.").  Insurers owed Pinnacle a duty to defend – and acknowledged that duty to defend, but then unilaterally chose to pay only certain defense costs, and contribute to the settlement, notwithstanding their outstanding defense obligations.

**C.     Pinnacle is a Named Insured under the National Union Policies.**

National Union has not, and cannot, dispute that Pinnacle is an insured under its policies. In fact, National Union has already admitted that Pinnacle is an insured under the National Union Policies in other court proceedings.  Hardiman Decl., Ex. D, at p. 1.

**D.     Pinnacle is an Additional Insured under the AGLIC Policy.**

AGLIC acknowledges that Arch agreed to defend Pinnacle as an additional insured under the Arch 2015 Primary Policy to which the AGLIC Policy follows form.  Dkt. No. 10 at ¶ 44

(citing Arch's June 27, 2018 Letter at Dkt. No. 13-5).  And AGLIC's coverage correspondence also concedes that Pinnacle qualified as an additional insured under the AGLIC Policy.  Dkt. No. 13-4 at 2.  Faced with the obligation to pay for the full amount of Pinnacle's defense costs, however, AGLIC now reverses course.

*First*, AGLIC asserts that Pinnacle has not "identified a written contract requiring Target to name it as an additional insured."  Motion at 13, n.3.  Yet, AGLIC attaches to its Counterclaims a contract, that states in no uncertain terms, that the terms and conditions at a Cliffs website were incorporated by reference.  Dkt No. 10-2.  And those terms and conditions (also attached to its Counterclaims) state unequivocally that Target's commercial general liability policy "shall be endorsed to include [Pinnacle] as an additional insured . . . ."  Dkt. No. 10-11.  Faced with that unequivocal contractual requirement, AGLIC asserts that the terms and conditions somehow are not part of the contract and/or the terms in some way limit the scope of Pinnacle's additional insured status.  Even assuming that AGLIC's assertions had any merit (which they do not), at minimum AGLIC's argument presents an issue of fact that cannot be resolved on a motion for judgment on the pleadings.  *See e.g.* Dkt. No. 13-5 (Arch agreed to defend Pinnacle and acknowledged that "[i]t is unclear . . . if the document produced to date, which post-dates Target's purchase order, comprises a written contractual agreement by Target to name Pinnacle as an additional insured").

*Second*, AGLIC now asserts that based on a settlement agreement which resolved Target's liability in the *Bluestone* Action, Pinnacle thereafter somehow no longer qualified as an additional insured.  The purported "Release of All Claims," dated April 16, 2018, and the Amended Release of all Claims, dated May 16, 2018, was executed by Bluestone and Double-Bonus, only (the "Target Release").  Neither Mission or Pinnacle were parties to the alleged agreement, and

Pinnacle's additional insured status is unchanged by the Target Release. In fact, AGLIC acknowledged its duty to defend Pinnacle even though it was aware of the Target Release. Dkt. No. 13-4 (acknowledging that Pinnacle was owed a duty to defend despite the May 25, 2018 Order dismissing all claims and all cross-claims against Target).

Pinnacle is an additional insured because Target was required under a written contract to be named as an additional insured. The mere fact that Target was dismissed does not mean that Pinnacle's liability was not caused "in whole or in part" by Target. The Court's order stated that the dismissal did not "prohibit any and all claims by any defendants for direct contractual indemnification against Target." And the very fact that Target's liability was resolved by a settlement payment plainly demonstrates that Pinnacle's liability was caused in whole or in part by Pinnacle as alleged in the *Bluestone* Action. Thus, the *Bluestone Action* complaint alleged that:

- "The drilling activities were undertaken by Cliffs and Pinnacle, as well as Target, which was the principal drilling contractor on the project." Dkt. No. 10-3 at ¶ 23.

- "Target, on behalf of and with the full consent, supervision and approval of Cliffs and Pinnacle, drilled the borehole such that it penetrated through an inactive portion of Mine No. 65. Defendants, including Target, Cliffs and Pinnacle, then attempted to install casing into the borehole. During the course of the borehole development, these Defendants materially deviated from the plans submitted to Plaintiffs and approved by MSHA." *Id.* at ¶ 24.

At minimum, there are issues of fact as to the terms of the Target Release, the intent of the parties that entered into the Target Release, the impact of the Target Release on Pinnacle's potential liability, and the terms of the contract between Target and Pinnacle. Arch understood that to be the case, which is why it agreed to defend Pinnacle despite the Target Release. *See* Dkt. No. 13-5 (Arch agreed to defend Pinnacle and acknowledged that "it appears that Pinnacle's liability, if any, for 'property damage' caused, in whole or in part, by Target's acts or omissions has been released in connection with the recent settlement of the claims asserted against Target in the Bluestone Suit.

To the extent there is ***no possibility*** that Pinnacle's potential liability for 'property damages' in the Bluestone Suit was caused, in whole or in part, by Target's acts or omissions, there is no coverage for Pinnacle as a purported additional insured under the Arch Policy." (Emphasis added)).  In fact, AGLIC reached the same conclusion.  Dkt. No. 13-4 ("AGLIC acknowledges a duty to defend Pinnacle as a putative additional insured").  Accordingly, at a minimum disputed issues of fact exist that preclude a motion for judgment on the pleadings.

**E.      Pinnacle Is Insured Under Both the AGLIC and National Union Policies.**

   **1.      The Unit Purchase Agreement is a Stock Purchase Transaction.**

The Unit Purchase Agreement is a stock purchase, not an asset purchase agreement, and Pinnacle's rights and liabilities were transferred with it.   "Under traditional stock purchase transactions, the ownership of an entity changes and *the entity continues to exist* with new shareholders."  4 New Appleman on Insurance Law Library Edition § 36.05 (2020) (emphasis added).  Under a stock sale agreement, a seller need not list out all assets that are being transferred, because by implication all rights and obligations are transferred.  *See Elliott Co. v. Liberty Mut. Ins. Co.*, 239 F.R.D. 479, 481 (N.D. Ohio 2006).  The Unit Purchase Agreement transferred ownership of Pinnacle's stock from Cliffs to Seneca – Pinnacle's rights to insurance transferred with it as Pinnacle remained the same entity that was insured under the Policies prior to the transaction.

   **2.      Pinnacle's Ownership Changed but it Retained its Separate Corporate Existence and Insurance Rights.**

Cliffs sold and transferred ownership of Pinnacle to Seneca.  The fact that Pinnacle had a new owner did not impact its rights under the insurance policies.  *See Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 167 F.Supp.2d 1004, 1009 (N.D.Ill.2001) (concluding that the "transfer of parent-level ownership" did not "affect any rights and duties"); *Elliott Co. v. Liberty Mutual Ins.*

*Co.*, 434 F.Supp.2d 483, 490–91 (N.D.Ohio 2006) (granting motion for reconsideration of decision finding plaintiff not entitled to coverage under insurance policies in context of a stock sale—previously mistakenly held to be an asset sale—and citing *Knoll*); *Intern. Flavors & Fragrances Inc. v. St. Paul Protection Ins. Co.*, No. 6017232008, 2011 WL 13269556, at *5 (N.Y. Sup. Ct. Sep. 14, 2011) ("[a]bsent special circumstances, a change in corporate ownership does not . . . change the subsidiary's obligations or rights under the insurance policy or otherwise" (citing *Knoll*)).

The cases insurers rely on to support their denial are distinguishable and inapplicable because they involve asset purchases.  In *Koppers*, KCI had two principal business units, (1) construction material and services, and (2) chemical and allied products.  *Koppers Indus., Inc. v. N. River Ins. Co.*, No. Civ. A.94-1706, 1996 WL 33577709 (W.D.Pa. Mar. 5, 1996).  KCI sold off the chemical and allied products group to Koppers, and KCI continued to operate its construction materials and services group.  Koppers sought insurance coverage from NRI, which issued policies to KCI, the named insured.  On summary judgment, the Court held that "Koppers has no interest in the insurance policies purchased by KCI" because "[a]s an initial matter, the Court recognizes, and the parties do not dispute, that Koppers was not a named insured under the insurance policies issued by NRI."  *Id.*  at *3.  Additionally, there was an explicit provision in the asset purchase agreement that stated that Koppers did not purchase any insurance policies relating to KCI's assets or the business.  *Id.*

Here, unlike in *Koppers*, Pinnacle was a named insured under the National Union policies, and an additional insured under the AGLIC Policy.  When Pinnacle was sold to Seneca, its corporate structure remained intact – it was a stock purchase, not an asset purchase.  Accordingly, Pinnacle's insurance rights were not changed as a result of the change in ownership.

It is for these same reasons that *Pilkington North America* also is distinguishable. *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St. 3d 482 (2006).  In *Pilkington*, LOF Glass changed its name to Libbey-Owens-Ford Company, and put the assets/liabilities of its glass manufacturing division into a new, wholly owned subsidiary, LOF Glass, Inc.  Libbey-Owens-Ford Company entered into a share exchange agreement with Pilkington entities, whereby shares of the newly formed LOF Glass, Inc. became owned by the Pilkington entities.  Pilkington obtained the glass business and the environmental liabilities.  Libbey-Owens-Ford Company remained in other lines of business, and had no connection with the glass business since its sale to the Pilkington entities.  Libbey-Owens-Ford Company's name changed to Aeroquip-Vickers, Inc. "All parties agreed[d] that the insurance policies under which Pilkington is seeking coverage were not transferred to Pilkington and that Aeroquip-Vickers, Inc. is the current owner of these policies."  *Id.* at 483.  Instead, Pilkington argued that the rights "under the policies followed by operation of law for environmental liabilities arising from the prior operation of that business."  *Id.* at 485.  The Court held:

> A commercial general liability policy can cover a business that maintains several plants or several different lines of business.  When selling one of those plants, or one of those lines of business, a contractual agreement to assign liability but not the underlying chose in action may be designed to preserve rights under the policy for the original insured.

*Id.* at 492.  That is not what happened here.  Again here, Pinnacle was sold in its entirety.  It is not the case as in *Pilkington* that one line of Pinnacle's business was sold to Seneca, one Pinnacle mine was sold to Seneca, or that other Pinnacle mines or divisions remained a part of Cliffs. Pinnacle's ownership changed, nothing else.

All of the cases that Insurers rely on are distinguishable because they were resolved on summary judgment (not judgment on the pleadings) and involve transactions where: (1) only a line of business was sold or part of a business was sold, not the entire company; and/or (2) the

17

transaction was an asset purchase, not a stock purchase where the company continued to exist in the same form after the transaction.   None of the cases on which Insurers rely involve circumstances where ownership of a corporation changed, and nothing more.   The facts in Mission Coal's First Amended Complaint are sufficient to establish that Pinnacle's rights under the insurance policies remained the same after ownership was transferred from Cliffs to Seneca.

**F.      Mission Coal Has the Right to Collect Pinnacle's Outstanding Defense Costs and the Policies' Non-Assignment Provisions Do Not Apply.**

Contrary to Insurers' allegations, the Policies' non-assignment provisions do not apply. When Pinnacle's ownership changed from Cliffs to Seneca, it retained its separate corporate existence.   There was no corporate predecessor or successor, because Pinnacle continued its existence with new owners.

When Pinnacle went into wind down, it assigned its rights to Mission Coal – after it had already incurred the defense costs at issue.   Under both Ohio and Pennsylvania law, insurance policy non-assignment clauses are unenforceable where the injury or occurrence takes place before the actual assignment.   *Egger v. Gulf Ins. Co.*, 588 Pa. 287, 296, 903 A.2d 1219, 1224 (2006) (construing Pennsylvania law in confirming the rule that "post-loss assignments" do not invalidate the insurance policy in question); *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 2006-Ohio-6551, ¶¶ 39-40, 112 Ohio St. 3d 482, 489, 861 N.E.2d 121, 128 (analyzing Ohio law in emphasizing that insurance policies are "generally construed such that assignment of an interest is valid after the occurrence of the loss insured against . . ."). *See also* 2 COUCH ON INSl § 34:2 ("Further, a provision in a policy of insurance which prohibits its assignment except with the consent of the insurer does not apply to prevent assignment of claim or interest in the insurance money then due after loss."); *id.* at § 35:8 ("the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments of the policy, except with the consent of

the insurer, apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising under the policy, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim."). The policies' anti-assignment provisions are not valid because the loss insured against was incurred before the assignment from Pinn MC Wind Down, LLC to Mission Coal.

## IV.    CONCLUSION

For the foregoing reasons, Insurers' Motion for Judgment on the Pleadings should be denied in its entirety, together with other such further relief as this Court deems just and proper.

Dated: November 13, 2020                    Respectfully Submitted

/s/ Brent K. Kesner

By:

Brent K. Kesner (WVSB #2022)
Barbara J. Keefer  (WVSB #1979)
Kesner & Kesner
P.O. Box 2587
Charleston, WV 25329
Direct dial: 304.720-8001
bkesner@kesnerlaw.com
bkeefer@kesnerlaw.com
304.720.8003

/s/ Alexander D. Hardiman

Alexander D. Hardiman (pro hac vice)
Janine M. Stanisz (pro hac vice)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Alexander.hardiman@pillsburylaw.com
Janine.stanisz@pillsburylaw.com
212.858.1000

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2020, I electronically filed the foregoing using the

Court's authorized CM/ECF system, which will send notification and provide access to such filing

to all counsel of record.

<u>/s/ Alexander D. Hardiman</u>

Alexander D. Hardiman (pro hac vice)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Alexander.hardiman@pillsburylaw.com
Janine.stanisz@pillsburylaw.com
212.858.1000

*Attorneys for Plaintiff*